IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JODY BRUNNER, | ) | CASE NO. 5:20-cv-01238 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jody Brunner ("Plaintiff" or "Brunner") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Brunner protectively filed[1] an application for DIB on February 12, 2017, alleging a disability onset date of May 9, 2016.  Tr. 13, 378-384.  Brunner subsequently amended her

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. We may use this date to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 6/11/2021).

1

alleged onset date to February 12, 2017.  Tr. 13, 246-247.  She alleged disability due to spinal

stenosis, spine and disc degeneration, sciatica on both sides, depression, anxiety, and high blood

pressure.  Tr. 310, 317, 407.  After initial denial by the state agency (Tr. 309-312) and denial

upon reconsideration (Tr. 317-319), Brunner requested a hearing (Tr. 322-323).  A hearing was

held before an Administrative Law Judge ("ALJ") on November 6, 2018.  Tr. 241-273.

In her February 21, 2019, decision (Tr. 10-32), the ALJ determined that Brunner had not

been under a disability from February 12, 2017, through the date of the decision (Tr. 14, 25).

Brunner requested review of the ALJ's decision by the Appeals Council.  Tr. 375-377.  On April

9, 2020, the Appeals Council denied Brunner's request for review, making the ALJ's decision

the final decision of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Brunner was born in 1970.  Tr.  248, 378.  She was 47 years old at the time of the

administrative hearing.  Tr. 248.  She has five boys, four of whom were adults and living outside

the family home at the time of the hearing.  Tr. 248-249.  Brunner's 14-year-old son was living

at home with Brunner and her husband.  Tr. 248.  Brunner graduated from high school.  Tr. 250.

Brunner's past work included work as a collection clerk; supervisor, order takers; and customer

service representative.  Tr. 266-267.  Her most recent job was a temporary job at a bank, working

in the customer service loan department.  Tr. 250-251.

### B.    Medical evidence[2]

#### 1.  Treatment history

---

[2] Brunner's appeal pertains only to the ALJ's consideration of her lumbar spine impairment.  Accordingly, the
evidence detailed herein is focused primarily on that medical condition.

In 2016, prior to Brunner's alleged onset date, Brunner had various diagnostic testing performed.  On May 20, 2016, an EMG/Nerve Conduction Study of the bilateral lower extremities was performed due to a history of bilateral lower extremity pain and parathesias.  Tr. 483.  The study was normal – there was no "electrodiagnostic evidence of peripheral polyneuropathy, bilateral lumbosacral radiculopathy or myopathy."  Tr. 483.  On October 19, 2016, a CT of the lumbar spine was performed due to a history of low back pain with pain radiating down both legs and weakness.  Tr. 564.   The impression was "[m]ild canal stenosis L4-L5 from facet joint degenerative changes and mild disc bulging.  Minor degenerative disc disease T12-L1.  No acute finding is evident on this exam."  Tr. 515, 564.  A few days later, on October 21, 2016, Brunner had an MRI of her lumbar spine.  Tr. 527-528, 570.  The MRI findings were similar to those shown on the CT examination.  Tr. 527-528, 570.

Brunner attended physical therapy for lumbar pain at the end of 2016 but was discharged on December 21, 2016 "[d]ue to non-compliance[.]"  Tr. 543.  The discharge summary indicated that Brunner was "seen 6 times for therapy, [c]ancelled 4 times and [n]o [s]howed 3 times."  Tr. 543.

In early 2017, Brunner received lumbar epidural steroid injections from the Aultman Center for Pain Management.  Tr. 551, 553.  Her first injection was on January 4, 2017, and her second injection was on February 3, 2017.  Tr. 551, 553.  At her second injection, Brunner reported some minimal relief from the prior injection.  Tr. 551.  Her pain level on February 3, 2017, was reported to be a 6/10.  Tr. 551.  Brunner described her pain as "continuous, aching, pins and needle, stabbing, shooting, burning in nature involving the lower back and radiating to both lower extremities."  Tr. 551.

On February 20, 2017, Brunner saw Dr. Daniel Dorfman, M.D., at Omni Orthopaedics for follow up regarding her back pain.  Tr. 585-587.  Brunner rated her pain a 10/10 that day.  Tr 585.  Comparing her symptoms to her most recent visit, Brunner relayed that her "symptoms [were] 100% worse."  Tr. 585.  She indicated that her pain was aggravated by the epidural injection.  Tr. 585.  She also indicated that physical therapy had not helped.  Tr. 585.  Brunner was taking Gabapentin and Hydrocodone but they were not alleviating her symptoms.  Tr. 586.  Dr. Dorfman observed that she was "ambulating with a slow, but symmetrical gait pattern."  Tr. 586. Brunner had pain with range of motion; her range of motion was limited; and she had diffuse tenderness of the lower lumbar musculature with no focal trigger points noted.  Tr. 586.  There was no objective sensory deficit observed to light touch in peripheral nerve or dermatomal distribution bilaterally.  Tr. 586.  Dr. Dorfman's impression was "[s]pinal stenosis at the L4-5 level with ongoing radicular symptoms incompletely alleviated with conservative management[]" and "[c]onnective tissue and disc stenosis of intervertebral foramen at the L4-5 level."  Tr. 586.  Since there was a failure of nonsurgical methods to alleviate Brunner's complaints, Dr. Dorfman referred Brunner to Dr. Mark Cecil, M.D., for surgical decompression. Tr. 586-587.  Dr. Dorfman recommended that Brunner continue taking Hydrocodone along with Gabapentin.  Tr. 587.

Brunner saw Dr. Cecil on April 3, 2017.  Tr. 795-797.  Brunner described her pain as aching, sharp, shooting and throbbing and rated her pain that day as a 7/10.  Tr. 795.  Brunner indicated that her pain radiated into her buttocks, legs, feet and toes and she had numbness and tingling in her feet bilaterally.  Tr. 795.  Brunner's symptoms were moderately alleviated with ice and lying down flat and aggravated with movement and walking.  Tr. 795.  In addition to medication, physical therapy, and injections, Brunner had tried chiropractic treatment.  Tr. 795.

4

Brunner relayed that her back pain had worsened over the prior six months.  Tr. 796.  She quit her call center job about a year earlier "secondary to back and bilateral lower extremity pain." Tr. 796.  Brunner was in the process of applying for social security disability.  Tr. 796.  Brunner reported that her then current medications were somewhat effective.  Tr. 796.  Also, Brunner indicated she tried to perform exercise at home using a recumbent bike.  Tr. 796.  On examination, Brunner was intermittently tearful; rose slowly from a seated position; and tended to stand with some truncal inclination.  Tr. 796.  However, she was in no acute distress and the balance of the examination findings were generally normal.  Tr. 796.  Following his examination and review of diagnostic testing, Dr. Cecil's impression was that Brunner had "lumbar spondylosis with lumbar spinal stenosis and adult de novo scoliosis with spondylolisthesis at L4-5." Tr. 796.  Dr. Cecil explained that any surgery "would involve major reconstruction of the thoracolumbosacral spine." Tr. 796-797.  After discussion, Brunner relayed that she wanted to proceed with further diagnostic testing, including a CT myelogram of the lumbar spine (a more sensitive and specific study than an MRI) and x-rays of the spine and pelvis.  Tr. 797.

The lumbar spine CT ordered by Dr. Cecil was performed on May 16, 2017.  Tr. 747-748, 805-806.  When Brunner saw Dr. Cecil for follow up on May 19, 2017, Dr. Cecil indicated that the lumbar spine CT myelogram "suggest[ed] lumbar spondylosis[]." Tr. 809, *see also* Tr. 747-748, 805-806.  However, he stated that "in my opinion, no compelling radiographic evidence to suggest surgically significant compressive pathology within the lumbar spine." Tr. 809.  Dr. Cecil further indicated that he was "hesitant to recommend surgical intervention which would include complex reconstruction of the thoracolumbosacral spine." Tr. 809.  Dr. Cecil also indicated that he "would recommend against 'conventional' spinal surgery" at that time.  Tr. 809. Instead, he thought that "pain management and behavioral modification would be appropriate."

5

Tr. 809.  Also, Dr. Cecil recommended that Brunner "consider possible trial implantation [of a] dorsal column stimulator [DCS] in an effort to ameliorate what are nonspecific lower extremity pain complaints that would not, in [his] opinion, be predictably resolved with conventional decompressive spinal surgery."  Tr. 809.  Dr. Cecil stated he would see Brunner following a DCS trial.  Tr. 809.

On May 24, 2017, Brunner sought emergency room treatment for chest pain.  Tr. 717. During that visit, she complained of other issues, including lower back pain and leg pain.  Tr. 717.  On examination, Brunner had normal range of motion, no edema, no deformity; her sensation and reflexes were intact; and her strength was 5/5 in her bilateral upper and lower extremities.  Tr. 719.

The following month, on June 18, 2017, Brunner sought emergency room treatment, complaining of lower back pain radiating into both her legs.  Tr. 745.  Brunner had been taking Percocet for her pain and explained that her medicine had run out and she needed a refill.  Tr. 745.  Examination findings were normal.  Tr. 745.  The emergency room diagnosis was lumbar radiculopathy.  Tr. 746.  Brunner was provided a prescription for Medrol Dosepak and Flexeril. Tr. 746.  She was instructed to see Dr. Cecil for further medication.  Tr. 746.

Brunner saw Dr. Cecil on July 7, 2017, for follow up regarding her back.  Tr. 816-819. Brunner wanted to discuss surgery.  Tr. 816.  She rated her pain as a 10/10.  Tr. 816.  Brunner relayed that her symptoms were "minimally alleviated by Percocet [and] [a]ggravated by prolonged sitting, standing and walking."  Tr. 816.  Dr. Cecil noted that there had been an incident between Brunner and his office staff which led him to discuss with Brunner "her 'rough' treatment" towards his office staff.  Tr. 817.  Dr. Cecil noted that he felt that Brunner understood his concerns about her behavior and it would not be a recurring event.  Tr. 817.  On physical

examination, Dr. Cecil noted that Brunner had "no new nor progressive motor or sensory

deficits." Tr. 818.  Dr. Cecil reviewed recent and past diagnostic testing and he indicated that his

impression was:

> [T]his patient does indeed have a complex issue wherein there are global
> degenerative changes of the axial skeleton much of which, at the present time,
> in my opinion is not amenable to obtaining predictable results with
> "conventional" spinal surgery. Nevertheless,  objective correlative clinical and
> radiographic evidence does imply symptomatic lumbar spinal stenosis with
> segmental spinal instability at L4-5. I had a lengthy discussion with the patient
> and her husband about the natural history of her pathology and treatment options
> available to them. I am disinclined to recommend complex "global"
> reconstruction of the axial skeleton (i.e. spinal deformity surgery), but rather
> recommend a limited and perhaps less comprehensive approach, that being
> lumbar decompression via laminectomy and facetectomy at L4-5 with segmental
> spinal fusion and instrumentation at L4-5 . . . The patient demonstrates excellent
> comprehension of the nature of her pathology, treatment options available to her,
> limitations of those treatment options and risks of those treatment options and,
> as informed consent has been achieved, will proceed.

Tr. 818.

On August 27, 2017, Brunner sought emergency room treatment, complaining of

back pain.  Tr. 856.  Brunner relayed that her symptoms had worsened over the prior three-

to-four days.  Tr. 856.  She had recently communicated with Dr. Cecil's office but did not

see him.  Tr. 856.  Dr. Cecil's office had not recommended any further prescriptions.  Tr.

856.  On examination, Brunner had 4/5 motor strength on dorsiflexion and plantar flexion

and she had range of motion in all four extremities.  Tr. 857.  Brunner had mild tenderness

to palpation over her lumbar midline spine and diffuse tenderness to palpation over the

bilateral trapezius, bilateral paraspinal, cervical, thoracic and lumbar spine.  Tr. 857.  Also,

Brunner had diffuse tenderness to palpation over her SI region and pain in the lumbar spine

with straight leg raise but it was not radicular pain.  Tr. 857.  Brunner's sensation was intact.

Tr. 857.  The emergency room provider treated Brunner with a dose of Morphine and Zofran

and prescribed a muscle relaxer and Valium.  Tr. 857.  Following administration of the pain

medication, Brunner's pain improved.  Tr. 857.  Brunner was instructed to follow up with

Dr. Cecil.  Tr. 857.

Subsequently, on August 24, 2017, Brunner saw Dr. Cecil prior to her surgery.  Tr.

1116-1118.  When examined, straight leg raising test was negative bilaterally for radiculitis.

Tr. 1117.  Dr. Cecil noted, "Clearly, this patient is difficult in some ways to assess given

symptom amplification."  Tr. 1117.  However, he indicated that "her symptoms are

consistent with a single segmental spinal instability[]" and they would proceed with surgical

intervention.  Tr. 1117.

Brunner's surgery (laminectomy at L4, bilateral facetectomies at L4-L5, posterior

segmental spinal instrumentation L4-L5, and posterolateral spinal fusion L4-L5) was

performed by Dr. Cecil on September 14, 2017.  Tr. 879-881.

Brunner saw Dr. Cecil on September 29, 2017, for a post-op appointment.  Tr. 931.

Brunner relayed that her then current pain was a 10/10.  Tr. 931.  She was having difficulty

sleeping and also difficulty with mobility.  Tr. 931, 932.  Her pain was radiating into her

hips, buttocks and feet.  Tr. 931.  Examination findings were negative and x-rays showed no

evidence of hardware failure and no evidence of progression of adult scoliosis.  Tr. 933.  Dr.

Cecil noted "[Brunner] is intermittently tearful today although she can rapidly be redirected

to a normal disposition without evidence of discomfort."  Tr. 932.  Dr. Cecil's impression

was that Brunner was "clinically better.  However, comorbid conditions most significantly

nonorganic factors probably associated with depression and anxiety exist.  I would not also

discount the chronic opioid utilization."  Tr. 933.  Dr. Cecil discussed with Brunner "the

natural history of healing" and relayed that he was "certainly cautiously optimistic" that

Brunner's condition would improve.  Tr. 933.  Dr. Cecil prescribed Zanaflex for spasms and instructed Brunner to continue with Neurontin and Percocet.  Tr. 933.  He wanted to see Brunner in three or four weeks and consider physical therapy at that time.  Tr. 933.

On October 6, 2017, Brunner went to the emergency room regarding her back pain. Tr. 918.  Brunner relayed that her pain was no different than it had been before her surgery. Tr 918, 920.  She was concerned that she was going to run out of her medications before she could see Dr. Cecil again.  Tr. 918.  Examination findings were unremarkable.  Tr. 920.  The emergency room provider did not think that diagnostic testing was needed at that time.  Tr. 920.  Brunner was given IM morphine and Zofran and was provided with a short course of Percocet until she could see Dr. Cecil again.  Tr. 920.

On October 12, 2017, Dr. Cecil spoke with Brunner and her husband by telephone after seeing a triage note that indicated Brunner was having increased pain and anxiety as a result of her pain.  Tr. 1041.  Dr. Cecil explained to them that he "felt that there were both organic and nonorganic issues at play here and, in fact, [he] believe[d] that a substantial component of [Brunner's] pain is secondary to 'chronic pain behaviors.'"  Tr. 1041.  Dr. Cecil indicated he would discuss the matter further with Brunner's primary care physician to see if they could find a way to control her pain short term while a long-term solution could be found.  Tr. 1041.

On October 18, 2017, Brunner saw Dr. David Gutlove, M.D., at Mercy Pain Medicine.  Tr. 908-911.  On examination, Dr. Gutlove noted that Brunner was "quite tearful."  Tr. 910.  Brunner had a lumbosacral orthosis brace on.  Tr. 910.  Dr. Gutlove described Brunner's gait as "fairly normal."  Tr. 910.  Brunner was able to "toe raise, heel raise and do deep knee bend without to[o] much difficulty."  Tr. 910.  However, she could

not perform lumbar extension or flexion motion.  Tr. 910.  Straight leg raise was negative in

a sitting position and deep tendon reflexes "were brisk but bilaterally symmetrical."  Tr.

910.  Dr. Gutlove's recommendations included counseling with a clinical rehabilitation

psychologist, moving towards a course of physical therapy (hopefully within the next

month), and short-term use of opioid with a goal of weaning her off in the next two to four

months.  Tr. 911.  Dr. Gutlove noted that Brunner was scheduled to see Dr. Martin at Omni

Orthopedics the following week.  Tr. 911.

On October 24, 2017, as planned, Brunner saw Dr. Gregg Martin, Ph.D., for a

psychological evaluation.  Tr. 934-935.  Dr. Martin noted that Brunner was referred for

psychotherapy for depression and to cope with chronic pain.  Tr. 934.  During the

evaluation, Brunner was very tearful and relayed that she was overwhelmed with pain and

depression and she was worried about her recovery.  Tr. 934.  Dr. Martin noted that Dr.

Gutlove had started Brunner on Lyrica but she had to stop because of side effects.  Tr. 934.

Dr. Gutlove had also switched Brunner from Percocet to OxyContin 10 mg.  Tr. 934.

Brunner indicated that, since switching to OxyContin, she had not slept for several days.  Tr.

934.  Dr. Martin's primary diagnosis was major depressive episode, recurrent, moderate to

severe and, his secondary diagnosis was pain disorder with medical and psychological

factors contributing, currently severe.  Tr. 935.  As prescribed by her primary care

physician, Brunner was taking Effexor for her depression.  Tr. 934.  Dr. Martin

recommended that Brunner switch to Cymbalta, noting that it might be more helpful in

reducing her pain instead of just helping her cope with her pain.  Tr. 935.  Dr. Martin also

recommended that Brunner see him every two weeks for psychotherapy.  Tr. 935.  Brunner

was amenable to Dr. Martin's recommendations.  Tr. 935.

10

Brunner saw Dr. Cecil again on October 27, 2017.  Tr. 936-939.  Brunner indicated that she was better than she was three weeks prior but she continued to have "'burning' pain" in her fingertips and toes.  Tr. 938.  She relayed that she did "not feel 'too horrible'" in the morning but after about six or seven hours her feet were "screaming" with pain.  Tr. 938.  Dr. Cecil recommended physical therapy but Brunner was scared of going because she was concerned that she would experience a flare up of her back pain.  Tr. 938.  Brunner's gait was normal and she rose "fairly rapidly from a seated position."  Tr. 938.  Straight leg raising testing was negative bilaterally for radiculitis.  Tr. 938.  Dr. Cecil indicated that, in a few weeks, they would reassess how Brunner was feeling with regard to her anxiety about physical therapy and "attempt to engage her in physical therapy."  Tr. 938.  Dr. Cecil thought there might be some benefit to an IV lidocaine trial but he deferred to Dr. Gutlove's opinion on that potential treatment.  Tr. 938.  Dr. Cecil "suspect[ed] that the most important intervention at [that] point would be the 'psychosocial piece' to address what may be a mood/adjustment disorder."  Tr. 938.

In late 2017 and early 2018, Brunner continued to seek emergency room treatment for her back pain and she continued to see Dr. Gutlove for pain management.  Tr. 895-907, 922-926.  At the emergency room on November 4, 2017, Brunner's physical examination was normal with a negative straight leg raise.  Tr. 923.  She was medicated with Valium, Toradol, and Dilaudid.  Tr. 922.  Brunner felt better following that treatment and was instructed to follow up with Dr. Cecil.  Tr. 922.

Brunner was seen at the emergency room the following month, on December 6, 2017.  Tr. 925.  Brunner indicated she was at the emergency room that night because she had run out of her narcotic medication.  Tr. 925.  She had taken her last dose of OxyContin

11

that morning and was reporting pain rated as a 10/10.  Tr. 925.  On examination, Brunner had some pain in the paraspinous region on palpation; her sensation and pulses were intact; and her gait was normal.  Tr. 926.  Brunner was given a one-time dose of Dilaudid in the emergency room, after which she was feeling better.  Tr. 926.  She was instructed to follow up with her doctor regarding a refill of her pain medication.  Tr. 926.

The following day, on December 7, 2017, Brunner saw Dr. Gutlove.  Tr. 899-900. Brunner reported occasional instances when her pain was markedly improved but the periods were short-lived.  Tr. 901.  Dr. Gutlove observed that Brunner was "alert and oriented and in no acute distress."  Tr. 900.  Also, Dr. Gutlove noted that Brunner "was actually smiling and her gait [was] much more fluid than [he'd] seen previously."  Tr. 900. However, Brunner did complain of some severe pain in her back.  Tr. 900.  She could "toe raise, heel raise and do deep knee bend without to[o] much difficulty."  Tr. 900.  Dr. Gutlove noted that Brunner had "overtook her OxyContin" by four pills.  Tr. 901.   Dr. Gutlove planned to change her OxyContin to a Duragesic patch and agreed to refill her OxyContin prescription one time.  Tr. 901.  He cautioned Brunner that, if she overused her medication again, he would not write her any further prescriptions of opioids.  Tr. 901.  Dr. Gutlove continued Brunner on other medications and suggested that she consider the Cleveland Clinic Foundation's inpatient comprehensive pain management program.  Tr. 901.

Brunner returned to see Dr. Cecil for a follow up on January 17, 2018.  Tr. 940-943. Brunner continued to have low back pain but reported that most of her pain was in her legs and feet and she rated her pain an 8/10.  Tr. 940, 942.  She was having numbness in her legs and feet bilaterally; difficulty walking; and associated cramping, pain stiffness and swelling.

12

Tr. 940, 941-942.  Dr. Cecil noted that, although Brunner had "had extensive imaging and laboratory evaluation[,]" they had "been unable to establish a 'discrete' source of the patient's pain."  Tr. 942.  Dr. Cecil further noted, "I believe that the patient's pain is likely multifactorial with both organic and nonorganic contributors.  She does admit that she has extreme anxiety."  Tr. 942.  On examination, Dr. Cecil observed that Brunner was in no acute distress; she sat comfortably; she rose fairly rapidly from a seated position; she preferred to stand rather than sit; she winced intermittently with pain, with the predominant area being her left buttocks; and her gait was normal and not antalgic or myelopathic.  Tr. 942.  Dr. Cecil's impression was that Brunner had "nonspecific pain, . . . the etiology of which [was] multifactoral."  Tr. 942.  Dr. Cecil indicated that "there [was] no compelling correlative clinical or radiographic evidence to suggest a 'surgical lesion.'"  Tr. 942.  Dr. Cecil's recommendations included a referral to a rheumatologist to rule out an autoimmune source of Brunner's pain and treatment for Brunner's neuropathic lower extremity pain through pain management.  Tr. 942.  Dr. Cecil also (with Dr. Gutlove's concurrence) recommended a referral to a tertiary pain center.  Tr. 942.  However, Brunner was not interested because she felt it would be too difficult to travel due to her pain.  Tr. 942.  Thus, Dr. Cecil referred Brunner to Dr. Zakari to determine whether Brunner might be a candidate for a trial dorsal column stimulator or lidocaine trial.  Tr. 942.  Depending on Dr. Zakari's opinion, Dr. Cecil might strongly recommend that Brunner be seen at a tertiary care center such as Cleveland Clinic for palliation of her pain.  Tr. 942.

The next day, on January 18, 2018, Brunner saw Dr. Gutlove.  Tr. 895-898.  Dr. Gutlove noted that six days after Brunner last saw him, Brunner had gone to the emergency room and reported being told there that she had screws protruding.  Tr. 895.  Dr. Gutlove

13

had followed up with Dr. Cecil regarding this report and Dr. Cecil indicated that the most recent CT scan from November 2017 showed a solid fusion with no loosening of the hardware and no lumbar pathology.  Tr. 895.  Dr. Cecil relayed to Dr. Gutlove that he received a note from the emergency room, indicating that when Brunner was there she reported being out of narcotics and the emergency room physician provided Brunner with a one-time shot of Dilaudid.  Tr. 895.  Dr. Gutlove noted that this was interesting because Brunner had seen him only six days before the noted emergency room visit and she had been provided with a one-month supply of Duragesic patch.  Tr. 895.

During her January 18, 2018, visit, with Dr. Gutlove, Brunner was tearful and she walked slowly with a deliberate gait but without an antalgic component.  Tr. 897.  Dr. Gutlove also observed that Brunner was alert and oriented and she had 5/5 strength in her lower extremities but with minimal range of motion in the lumbar spine due to pain.  Tr. 897.  There was 1+ edema in the lower extremities distally.  Tr. 897.  Dr. Gutlove's plan was to continue to wean Brunner off opioids.  Tr. 898.  Due to Brunner's reported problems with withdrawal symptoms, Dr. Gutlove changed her Duragesic patch back to OxyContin and he provided Brunner with a prescription for medication that Brunner could use if she continued to have withdrawal symptoms (but with caution because of the blood pressure medication that Brunner was taking).  Tr. 898.  Dr. Gutlove suggested future treatment options might be a TENS unit and referral to Cleveland Clinic for a comprehensive pain management program.  Tr. 898.

Brunner then saw Dr. Krishna Satyan, M.D., at the Center for Neuro and Spine on January 19, 2018, for evaluation regarding her low back pain.  Tr. 944-949.  Brunner relayed that, since her surgery, she had been having worsening bilateral lower extremity

14

pain, numbness, tingling, and weakness.  Tr. 944.  Brunner reported that she felt like her legs were burning and she was unable to move without having significant pain.  Tr. 944.  Also, Brunner reported having intermittent swelling in her legs.  Tr. 944.  Brunner was tearful during her visit and reported that her symptoms had not improved with pain management and she was concerned about what might be wrong with her back.  Tr. 944.  Dr. Satyan ordered a lumbar CT and lumbar myelogram to see if there was compression in the nerve roots.  Tr. 944, 948.  On examination, Dr. Satyan observed that Brunner's gait was "compensated [and] antalgic [on] both sides[.]"  Tr. 947.  Brunner did not use an assistive device.  Tr. 947.  On straight leg raise, there was radiation on both sides.  Tr. 947.  Otherwise, examination findings were normal, including normal strength, normal sensation, and normal coordination.  Tr. 947.

Brunner again sought emergency room treatment on January 31, 2018, complaining of bilateral lower extremity and back pain.  Tr. 966-982.  On examination, Brunner was able to move all extremities well and there was no obvious edema; she was alert, awake, appropriate, and she had normal speech; her gait was normal; there was some perilumbar tenderness to palpation; there was no tenderness to palpation over the SI regions; straight leg raise was negative bilaterally; patellar reflexes were 2+ bilaterally; and sensation was intact in the bilateral lower extremities.  Tr. 968-969.  The emergency room provider found the findings to be consistent with "acute on chronic back pain."  Tr. 969.  Following treatment with Morphine and Zofran, Brunner felt improvement.  Tr. 969.  She was instructed to follow up with her treating medical providers and specialists.  Tr. 969.  She was also provided with a referral list for neurology for further evaluation.  Tr. 969.

Upon Dr. Cecil's referral, on February 5, 2018, Brunner saw Dr. Adel Zakari, M.D., at the Advanced Pain Management Institute, regarding a spinal cord stimulator trial.  Tr. 1063-1066.   At times during the examination, Brunner was tearful.  Tr. 1065.  Dr. Zakari observed limited range of motion in the lumbar spine with flexion and extension; moderate tenderness on palpation of the lower lumbar paraspinal area bilaterally; moderate tenderness on palpation of the sacroiliac joints; positive straight leg raise bilaterally; "antalgic and short stepped" gait; ambulation without an assistive device; inability to perform heel and toe walking; no gross weakness; normal sensation to light touch; no peripheral edema in the lower extremities; good range of motion in the hips bilaterally; and negative FABER test bilaterally.  Tr. 1065.  Dr. Zakari noted that Brunner reported improvement of her lower back pain following surgery but she continued to have persistent diffuse pain in her lower extremities.  Tr. 1065.  Prior to proceeding with the spinal cord stimulator trial, Dr. Zakari referred Brunner to Dr. Gregg Martin for psychological evaluation and clearance.  Tr. 1065. Dr. Zakari indicated that, if the spinal cord stimulator trial was successful, as defined by 50% improvement in the pain, Brunner would be referred to Dr. Cecil for spinal cord stimulator implant.  Tr. 1066.

The lumbar spine CT myelogram was performed on February 14, 2018.  Tr. 1071-1072.  It showed that the right L5 pedicle screw was breaching the anterior cortex; there was L4-5 grade 1 spondylolisthesis with left foraminal disk protrusion causing moderate to severe narrowing of the left neural foramen; and severe degenerative disk disease at the T12-L1 level.  Tr. 1072.

On February 23, 2018, Brunner returned to see Dr. Satyan for follow up regarding her diagnostic testing and her back pain.  Tr. 1076-1079.  Examination findings were

16

normal.  Tr. 1078.  Dr. Satyan indicated that the CT myelogram showed "postop changes from the L4-5 decompression and fusion.  [Brunner] may have some foraminal stenosis at left L4-5.  However, it looks like they did an adequate bony removal."  Tr. 1078.  Dr. Satyan also indicated, "I do not see how any further surgery would benefit at this point."  Tr. 1078.  Dr. Satyan recommended that Brunner return to Dr. Cecil and have him review the imaging results and continue to follow up with pain management and physical therapy.  Tr. 1078.

Brunner saw Dr. Cecil on February 28, 2018.  Tr. 1131-1134.  On examination, Brunner rose rapidly from a seated position; her gait was normal and not antalgic or myelopathic; her motor strength was 5/5; and straight leg raise was negative bilaterally for radiculitis.  Tr. 1133.  Dr. Cecil's impression at that time was that Brunner had "some variant of chronic pain syndrome."  Tr. 1133.  Dr. Cecil did not feel that "additional 'conventional' spinal surgical intervention would be appropriate."  Tr. 1133.  Dr. Cecil noted that he would see Brunner after the DCS trial and after her rheumatology evaluation.  Tr. 1133.  Noting that "the etiology of [Brunner's] pain [was] likely multifactoral and involve[d] both organic and nonorganic pathologies," Dr. Cecil described Brunner's prognosis as "guarded" at that time.  Tr. 1133.

On March 9, 2018, Brunner saw Dr. Zakari.  Tr. 1095.  Brunner reported that her symptoms had worsened since her last visit with Dr. Zakari.  Tr. 1095.  She indicated that she had been going to physical therapy.  Tr. 1095.  Brunner relayed that she had an appointment scheduled with Dr. Martin the following week for the psychological evaluation needed before proceeding with the spinal cord stimulator trial.  Tr. 1095.  Dr. Zakari noted Brunner ambulated with a cane.  Tr. 1095.  Her gait was "antalgic and short stepped."  Tr. 1097.  There was moderate tenderness to palpation in the lower lumbar paraspinal area

17

bilaterally and in the sacroiliac joints. Tr. 1097. Seated straight leg raise was positive bilaterally. Tr 1097. Sensation was normal to light touch and reflexes were 2+ at the knees. Tr. 1097. There was no peripheral edema in the lower extremities and there was good range of motion in the hips. Tr. 1097. She was taking Gabapentin and Percocet for her pain. Tr. 1095. Brunner relayed that she was interested in getting another opinion from the Cleveland Clinic. Tr. 1098. Dr. Zakari prescribed a Medrol Dosepak and instructed Brunner to continue with Percocet as needed for pain. Tr. 1098. Also, Brunner was instructed to continue with Gabapentin and physical therapy. Tr. 1098.

Brunner returned to see Dr. Zakari a week later on March 16, 2018, complaining of worsening symptoms. Tr. 1228. Brunner relayed that she had recently seen Dr. Martin but was informed by him that he did not perform psychological evaluations for spinal cord stimulators. Tr. 1228. Examination findings were similar to the prior visit. Tr. 1230. Brunner reported that her pain was better controlled when she was on OxyContin. Tr. 1230. Dr. Zakari increased the Percocet dosage to be taken as needed for pain. Tr. 1230. In addition to prior recommendations, Dr. Zakari indicated that Brunner would continue to ambulate with assistance to minimize risk of fall[3] and he recommended use of a TENS unit. Tr. 1231.

Upon Dr. Cecil's referral, on March 16, 2018, Brunner saw Dr. Achal Valdya, M.D., at the Arthritis Clinic of Stark County, Inc. for a consultation regarding her back and lower extremity complaints. Tr. 1224-1227. Dr. Valdya noted that Brunner was in tears when describing her symptoms and begged for help with managing her pain. Tr. 1224. Brunner reported having issues ambulating and using a cane for the last several weeks. Tr. 1224.

---

[3] There was no history of a recent fall. Tr. 1228.

Dr. Valdya observed that Brunner used a cane and had an antalgic, slow gait.  Tr. 1225.  Dr. Valdya could not check Brunner's range of motion in the spine due to pain.  Tr. 1225.  No abnormalities were noted on examination of Brunner's lower extremities.  Tr. 1226.  Dr. Valdya's primary diagnosis was primary generalized (osteo) arthritis but there was no inflammatory arthritis noted.  Tr. 1226.  Dr. Valdya ordered some further diagnostic testing and recommended that Brunner continue with pain management.  Tr. 1226.

Brunner saw Dr. Zakari on April 11, 2018, for follow up.  Tr. 1234-1237.  Brunner reported that her symptoms had improved since her last visit – she had improved pain control with taking Percocet three times per day.  Tr. 1234.  She was also taking Gabapentin when needed for pain and Baclofen when needed for pain/muscle spasms.  Tr. 1234.  Brunner rated her pain a 5/10.  Tr. 1234.  She was scheduled to see a different doctor for psychological evaluation prior to the spinal cord stimulator trial and she also had scheduled an appointment at the Cleveland Clinic for a second surgical opinion.  Tr. 1234.  Dr. Zakari observed that Brunner appeared to be in moderate distress at times, secondary to pain but she was pleasant and appeared more comfortable than she had during her prior examination.  Tr. 1236.  There was mild tenderness to palpation of the lumbar paraspinal area and moderate tenderness of the sacroiliac joints; sitting straight leg raise was negative bilaterally; her gait was "antalgic and short stepped" and she ambulated with a cane; sensory examination was normal to light touch; reflexes were 2+ at the knees; there was no peripheral edema in the lower extremities; and there was good range of motion in the hips.  Tr. 1236.  Along with recommendations regarding medications and using an assistive device for ambulation, Dr. Zakari encouraged Brunner to stay active and exercise on a regular basis.  Tr. 1237.

On April 23, 2018, Brunner saw Dr. Michael Steinmetz, M.D., at the Cleveland Clinic for a surgical consult.  Tr. 1262-1265.  Examination findings were normal.  Tr. 1264. Dr. Steinmetz recommended another lumbar CT scan and that Brunner see another physician – Dr. Vucetic – for evaluation for conservative pain management.  Tr. 1264.

Upon Dr. Steinmetz's referral, Brunner saw Dr. Henry Vucetic, M.D., on May 31, 2018, for a pain management consultation.  Tr. 1398-1403.  Brunner relayed that she could tolerate her back pain with ice and Tylenol but not her lower extremity pain.  Tr. 1398. Brunner relayed that her foot pain was the most problematic issue for her.  Tr. 1402.  She had stopped all her opioids on May 8 but had withdrawal symptoms.  Tr. 1398.  She also tried to stop Gabapentin but after being off it for 48 hours she could not tolerate the pain. Tr. 1398.  On examination, Dr. Vucetic observed an antalgic gait, muscle spasms, reduced range of motion and some decreased sensation in the lower extremities.  Tr. 1401.  Her strength, muscle tone and coordination were normal and straight leg raise test was normal. Tr. 1401.  Dr. Vucetic felt that Brunner's foot problems sounded more like small fiber neuropathy rather than radicular in nature.  Tr. 1402.  Dr. Vucetic noted that Brunner had a normal EMG prior to her surgery but he recommended she have another one.  Tr. 1402.  He also recommended a caudal epidural steroid injection (ESI) and physical therapy, noting that Brunner had not been to physical therapy since her surgery but it was something he felt she needed.  Tr. 1402.  Brunner had a caudal ESI on June 11, 2018.  Tr. 1404-1405.

On June 25, 2018, Brunner went to the emergency room for her back pain.  Tr. 1238-1241.  Brunner explained that she had run out of her Gabapentin and could not pick up her prescription until the next day.  Tr. 1238.  She reported a pain level of 10/10.  Tr. 1238. With the exception of right-sided paralumbar tenderness and midline surgical scar,

examination findings were generally normal.  Tr. 1240.  Brunner was provided with a dose of Gabapentin as well as Morphine and Zofran while at the emergency room and advised to follow up with her physicians.  Tr. 1240.  She was discharged in stable condition.  Tr. 1240.

On Dr. Steinmetz's order, on April 21, 2018, Brunner had an MRI of her lumbar spine.  Tr. 1340-1341.  The impression was "[m]ild multilevel degenerative changes with a superimposed L4-L5 fusion and laminectomy.  No stenosis at any level."  Tr. 1341.

On September 5, 2018, Brunner saw Dr. Steinmetz.  Tr. 1425-1428.  Brunner was continuing to have pain and was "staying largely immobile."  Tr. 1425.  Dr. Steinmetz observed an antalgic gait and some sensory deficits at L4, L5, and S1.  Tr. 1426.  Dr. Steinmetz indicated that there was no nerve compression shown on the CT scan or MRI.  Tr. 1426.  However, he noted that there was "breech of anterior sacrum with the right S1 screw but her symptoms in her legs [were] bilateral."  Tr. 1426.  Dr. Steinmetz felt there was "a chance she [did] not have a solid fusion and [that] could be a cause of some of her pain."  Tr. 1426.  Dr. Steinmetz ordered another lumbar CT and noted that he felt that Brunner's best option at that time was a spinal cord stimulator trial.  Tr. 1426.

In September 2018, Brunner started attending physical therapy due to her chronic bilateral low back pain and lower extremity pain.  Tr. 1362-1390.  She attended sessions in September and October 2018.  Tr. 1389.

Brunner saw Dr. Vucetic on October 3, 2018, for follow up.  Tr. 1414-1420.  Brunner reported her pain level was 8/10.  Tr. 1414.  She was interested in adjusting her medications and proceeding with the spinal cord stimulator because her medications were "not holding her over through the day[.]" Tr. 1414.  She did relay that her then current medications allowed her to maintain her activities of daily living.  Tr. 1414.  On

21

examination, Brunner had decreased range of motion, tenderness, pain and spasm in her lumbar spine.  Tr. 1418.  Neurologically, Brunner had normal strength, no weakness, no atrophy, and no tremor.  Tr. 1418.  She had a sensory deficit in the lower extremities and abnormal gait but, her muscle tone, coordination and straight leg raise were normal.  Tr. 1418.  Dr. Vucetic indicated that Brunner had chronic low back and leg pain with chronic radiculopathy as seen on EMG.  Tr. 1419.  He agreed that Brunner was a good candidate for a spinal cord stimulator and referred her for a psychology consult.  Tr. 1419.  Dr. Vucetic increased Brunner's Percocet dosing to address her radiculopathy in the lumbar region.  Tr. 1419.

An October 5, 2018, a CT scan of the lumbar spine showed that there was no "solid bone fusion with epidural site[]" but Brunner's "[h]ardware [was] intact without signs of loosening[] [and] [a]lignment [was] unchanged."  Tr. 1343.

### 2.  Opinion evidence

In connection with Brunner's social security disability application, on March 15, 2017, Dr. Jay Smith, D.C., who first examined Brunner on September 15, 2016, completed a statement.  Tr. 697-698.  Dr. Smith reported that Brunner's clinical abnormalities included cervical, thoracic, and lumbar pain; sciatica; and the presence of thoracolumbar curvature.  Tr. 697.  Dr. Smith noted that he had observed decreased sensation in the L5 dermatome; spasm of the trapezius and lumbar paravertebral muscles; and reduced lumbar range of motion.  Tr. 697.  Dr. Smith indicated that Brunner's gait was normal and no ambulatory aid was used.  Tr. 697.  He indicated that, despite therapy, the findings he noted in the statement had persisted.  Tr. 697.  Dr. Smith further indicated that, Brunner had been "slow to respond to care[.]  However, [she] still

had same complaints at time of last visit." Tr. 697. Brunner was unable to complete treatment with Dr. Smith due to financial reasons. Tr. 697.

On March 27, 2017, state agency reviewing consultant, Venkatachala Sreenivas, M.D., completed a physical RFC assessment. Tr. 283-285. Dr. Sreenivas opined that Brunner had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and ability to push and/or pull was "unlimited, other than shown for, lift and/or carry. Tr. 283-284. Dr. Sreenivas also opined that Brunner could never climb ladders/ropes/scaffolds but she could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl. Tr. 284. Also, Dr. Sreenivas opined that Brunner would need to avoid exposure to unprotected heights and heavy machinery. Tr. 285.

Upon reconsideration, on August 10, 2017, state agency reviewing consultant Dr. William Bolz, M.D., completed a physical RFC assessment. Tr. 300-302. His assessment was similar to Dr. Sreenivas' assessment except for the postural limitations. Like Dr. Sreenivas, Dr. Bolz opined that Brunner could never climb ladders/ropes/scaffolds and she could occasionally climb ramps/stairs, stoop, and crawl but Dr. Bolz opined that Brunner could frequently, rather than occasionally, balance, kneel, and crouch. Tr. 301.

## C.   Hearing testimony

### 1.   Plaintiff's testimony

Brunner testified and was represented at the hearing.[4] Tr. 244, 248-264, 267. When Brunner was asked why she was unable to work, Brunner stated:

> Well, I have a lot of pain, first off. My balance and coordination is terrible. Peripheral neuropathy is in my fingers and -- and my legs and feet. And I'm sure

---

[4] During the hearing, Brunner needed to stand up. Tr. 253.

you've dealt with neuropathy before that it can have various amounts of pain.  Also, with the medication I'm on, I'm very -- I have trouble focusing, finding words, sitting for long periods of time or even standing and walking.

Tr. 254.  Brunner discussed the different treatment she had tried to address her pain.  Tr. 254-255.  She estimated being able to walk at one time a block or two on a good day.  Tr. 255-256.  With respect to her ability to stand, Brunner stated that "the pain would get so bad after five, ten minutes."  Tr. 256.  Brunner indicated that her ability to sit "varie[d] between good and bad days."  Tr. 256.  She explained that, if she can lean back, she "can sit sometimes between 20, 40 minutes."  Tr. 256.  However, she indicated "I'm shifting in my seat the whole time and . . . it just hurts and my hands hurt."  Tr. 256.

On a normal, moderate day, Brunner wakes up and takes her medicine before her son gets up so she can move around a little easier.  Tr. 257.  She makes breakfast for her son and has her son's clothes laid out for him.  Tr. 257.  After her son leaves for school, depending on how Brunner slept the night before, she lies down for an hour to three hours.  Tr. 257.  When she is able to get back up, she tries to shower and get herself dressed.  Tr. 257.  Sometimes taking a shower is difficult for Brunner because it feels like "tacks hitting [her] skin."  Tr. 257.  After getting dressed, Brunner tries to straighten up around the house but her husband does most of the cleaning.  Tr. 257, 258-259.  Brunner is able to do some light cooking and help out with the laundry.  Tr. 257-259.  Her husband does all the grocery shopping.  Tr. 258.  On a bad day, Brunner indicated she was in bed all day.  Tr. 257.  Brunner estimated that more than half of the days in a month would be classified as bad days.  Tr. 257.

Because of her impairments, Brunner was not able to see her son play basketball for the whole season and she was unable to participate in any of the activities surrounding her son's participation in basketball.  259-260.  During the day, when her son is at school and her husband

24

is at work, Brunner is home alone.  Tr. 260-261.  She passes the time watching television or she might try to read or fold some laundry.  Tr. 261.

Brunner indicated that the best thing to relieve her pain is to lie down.  Tr. 261.  She also has a TENS unit, Lidocaine cream, a body massager, and ice and heat packs.  Tr. 261, 262.  She relayed that she has "tried everything to kind of to relieve" her pain but it "just never completely goes away."  Tr. 261.  Brunner was waiting on a psychiatric clearance prior to proceeding with a spinal cord stimulator trial.  Tr. 262-263.  Brunner was hoping that the spinal cord stimulator helped.  Tr. 264.

Brunner's side effects included a "cloudy mind," drowsiness, confusion, problems with balance and coordination, blurry vision, and nausea.  Tr. 263.  She relayed that she had trouble falling asleep because of her pain.  Tr. 264.  Once she is asleep, she usually wakes up an hour or two later from the pain.  Tr. 264.  When asked how her pain level was at that time of the hearing, Brunner indicated it was "up there on the six, seven.  I can't get comfortable."  Tr. 263.

### 2.  Vocational expert's testimony

A vocational expert ("VE") testified at the hearing.  Tr. 265-271.  The VE classified Brunner's past work as including work as a collection clerk; supervisor, order takers; and customer service representative.  Tr. 266-267.

The VE was then presented with different hypotheticals.  Tr. 267-271.  In response to a sedentary hypothetical question mirroring the RFC found by the ALJ, the VE indicated that the described individual would be unable to perform Brunner's past relevant work but there would be jobs in the national economy that the described individual could perform, including addresser, document preparer, and film touch-up inspector.  Tr. 268, 269.

Brunner's counsel asked the VE to consider the same sedentary hypothetical but to add that, due to pain, medication side effects or other symptoms, the described individual would be absent from work, or have to leave early from work, three times or more per month on a regular and ongoing basis.  Tr. 270.  The VE indicated that, if in addition to some absences, the individual was leaving an hour or more early from work (with the total of those occurrences being at least three per month on a regular and continuous basis) there would be no work available for the described individual.  Tr. 270.  If the individual described in the sedentary hypothetical did not have regular and continuous absences but was off task for more than 20 percent of the workday, there would also be no work available.  Tr. 271.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[5] . . . .

42 U.S.C. § 423(d)(2).

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

26

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her February 21, 2019, decision, the ALJ made the following findings:[6]

1.   Brunner meets the insured status requirements through June 30, 2020.  Tr. 15.

---

[6] The ALJ's findings are summarized.

27

2.      Brunner has not engaged in substantial gainful activity since February 12, 2017, the alleged onset date.  Tr. 16.

3.      Brunner has the following severe impairments: lumbar stenosis and degenerative disc disease, status-post fusion [hereinafter, collectively, the "lumbar impairment"], degenerative disc disease and stenosis of the cervical spine [hereinafter, collectively, the "cervical impairment] and depression, diagnosed as major depressive disorder.[7]  Tr. 16.

4.      Brunner does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 16-18.

5.      Brunner has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that she may frequently balance; occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes or scaffolds; she must avoid all exposure to workplace hazards, including unprotected heights and moving mechanical parts; she is limited to the performance of work tasks undertaken in a work setting that is routine, in that it contemplates few changes in workplace tasks or duties.  Tr. 18-24.

6.      Brunner is unable to perform past relevant work.  Tr. 24.

7.      Brunner was born in 1970 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.  Tr. 24.

8.      Brunner has at least a high school education and is able to communicate in English.  Tr. 24.

9.      Transferability of jobs skills is not material to the determination of disability.  Tr. 24.

10.     Considering Brunner's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Brunner can perform, including addresser, document preparer, and film touch-up inspector.  Tr. 24-25.

---

[7] The ALJ found Brunner's carpal tunnel syndrome, status post-release, to be a non-severe impairment.  Tr. 16.

Based on the foregoing, the ALJ determined that Brunner had not been under a disability, as defined in the Social Security Act, from February 12, 2017, through the date of the decision. Tr. 25.

## V. Plaintiff's Argument

Brunner argues that the ALJ's finding that Brunner retained the RFC to perform a range of sedentary work is not supported by substantial evidence because the ALJ did not properly evaluate the evidence relating to Brunner's back pain.   Doc. 14, pp. 13-17, Doc. 18, pp. 2-4.

## VI.    Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the

29

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v.*

*Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The undersigned recommends that the Court affirm the Commissioner's decision**

Brunner argues that the ALJ's sedentary RFC is not supported by substantial evidence,

arguing that the ALJ did not properly evaluate evidence pertaining to her back pain.  Doc. 14, pp.

13-17, Doc. 18, pp. 2-4.

The Regulations make clear that a claimant's RFC is an issue reserved to the

Commissioner and the ALJ assesses a claimant's RFC "based on all the relevant evidence" of

record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).  The ALJ considered and discussed the

medical evidence relating to Brunner's back impairment in detail, stating:

> In terms of the claimant's alleged lumbar impairment, the claimant underwent
> laminectomy and fusion surgery on September 14, 2017, to correct instability of
> the L4-5 vertebral joint (22F/21, 23).  While this finding would be consistent with
> the claimant's allegations of low back pain, the record, when considered as a whole,
> is not supportive of the contention that the existence of this impairment would be
> preclusive of all types of work.
>
> Diagnostic scanning of the lumbar spine, dated October 19, 2016, indicated mild
> canal stenosis and a mild disc bulge at the L4-5 vertebral joint, but no compressive
> pathology at any lumbar level (4F/21).  Subsequent scans, on November 15, 2017
> (25F/31), February 14, 2018 (27F/2), and October 5, 2018 (38F/5), have all
> confirmed no compressive pathology at any lumbar level. Scans from and after
> November 15, 2017 have likewise confirmed preserved alignment and surgical
> hardware, without loosening.
>
> Diagnostic imaging of the lumbar spine, dated October 21, 2016 indicated mild,
> multi-level bulges and "minimal" anterolisthesis of L4 over LS, but no compressive
> pathology at any lumbar levels (4F/33).  Diagnostic imaging of the lumbar spine,
> dated August 21, 2018, reported expected post-operative changes at the L4-5
> vertebral joint, and mild multi-level degenerative changes, but no stenosis at any
> lumbar level (38F/3).
>
> Electrodiagnostic testing of the lower extremities, dated May 20, 2016, reported
> normal findings, negative specifically for radiculopathy or peripheral neuropathy
> (2F/2).

Notably, the claimant's surgeon was reluctant to perform surgery (18F/21); however, the claimant insisted (18F/29).   At her hospital discharge, she reported marked diminution of her radicular symptoms (22F/21).

She has consulted with several other surgeons; however, there is no indication for further surgical intervention (28F/3), (41F/2).

On at least three occasions, the possibility of a spinal cord stimulator trial has been suggested (18F/21), (26F/34), (41F/2); however, the claimant has yet to attempt the necessary, pre-requisite psychological clearance (24F/27), (26F/34), (42F/25) as of the date of this writing.

She has been referred to physical therapy (24F/27), but delayed this for close to a year.  She attended two or three sessions between September 27, 2018 and October 2, 2018 (39F).  On October 2, 2018, she tolerated the treatment well, and reported some improvement in her pain (39F/15), but that is the last treatment session noted in the record.

The claimant has been involved in formal pain management in at least three practices.  She left the first practice after certain of her behaviors had led the practitioner to institute a regimen weaning her from all opioids (23F/4, 1).  Her most recent provider has attempted one caudal epidural steroid injection, on June 11, 2018 (40F/12); however, there is no information provided regarding the efficacy of the treatment.

The claimant continues to follow a regimen of prescription medications discernibly addressed to this impairment (3E/5), (31F/3), used with side effects including blurry vision, dizziness, drowsiness and feeling "off-balance" (5E/8), inconsistently reported (9E/6), but which she describes as at least partially effective (18F/8), (30F/24), (40F/l7).

Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or normal findings, including one dated February 3, 2017, which indicated diffuse tenderness to the lumbar spine with reduced flexion and extension, with four of five ankle strength [but with give-away weakness] and otherwise normal strength of the lower extremities, with normal sensory function and a slow, but symmetrical gait (10F/3), one dated January 31, 2018, which indicated perilumbar tenderness but no sacroiliac tenderness, with a normal gait, negative straight leg raises, normal reflexes and sensation (25F/4), or one dated June 25, 2018, which indicated right-sided paralumbar tenderness, but normal range of motion in all extremities, normal strength and sensation, with negative straight leg raises (38F/11).   Her most recent  clinical examination, dated October 3, 2018, indicated reduced range of motion, tenderness and pain, with a listing gait to the right, positive sacroiliac provocation test, reduced sensation in a stocking pattern, but negative straight leg raises, normal coordination, reflexes and strength (42F/25).

31

***

In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged.  In a setting where the claimant would be restricted to the performance of work at the sedentary exertional level, would frequently balance, occasionally stoop,  kneel, crouch, crawl, climb ramps and stairs, but never climb ladders, ropes or scaffolds; and, where the claimant would avoid all exposure to workplace hazards, including unprotected heights and moving mechanical parts, adequate allowance will have been made for these impairments.

Tr. 19-20, 21.

In addition to the treatment records relating to Brunner's lumbar impairment, the ALJ considered other evidence, including evidence regarding Brunner's daily activities and the opinions from the state agency reviewing consultants and a chiropractor.[8]  Tr. 22-23.

Brunner contends that the sedentary RFC is not supported by substantial evidence for two reasons.  First, she contends that the ALJ's statement that Brunner's surgeon was reluctant to perform surgery improperly suggests that Brunner's surgery was not medically necessary, not consistent with the severity of the symptoms Brunner alleged, and that the surgery was only performed because Brunner insisted upon it.  Doc. 14, p. 14.   Brunner asserts that the ALJ's finding regarding the surgery constitutes a mistake of fact, arguing that there is "no evidence that the doctor performed surgery against his wishes or against the medical evidence."  Doc. 14, p. 15, Doc. 18, p. 3.

The ALJ did not conclude that the surgery was not medically necessary nor did she conclude that the surgery was performed against the surgeon's wishes.  Additionally, the record evidence does indicate that Brunner's surgeon, Dr. Cecil, initially recommended against "conventional" spinal surgery and instead recommended pain management and a spinal cord

---

[8] Although Jay Smith, D.C., Brunner's chiropractor, was not an acceptable medical source, the ALJ considered the opinion.  Tr. 23.  There were no other opinions from examining or treating physicians pertaining to Brunner's physical impairments.  Tr. 24.

stimulator trial (Tr. 809) and that Brunner remained interested in proceeding with surgical intervention (Tr. 817). Further, during a subsequent visit when Brunner indicated she was still interested in surgery, Dr. Cecil, after discussion with Brunner and review of objective evidence, continued to indicate that he did not think that "conventional" spinal surgery was the route to go but did, at that time, recommend "a limited and perhaps less comprehensive approach, that being lumbar decompression via laminectomy and facetectomy at L4-5 with segmental spinal fusion and instrumentation at L4-5." Tr. 818. This surgery, as noted by the ALJ, was performed on September 14, 2017. Tr. 19. Thus, the ALJ's finding that Brunner's surgeon was reluctant to perform surgery and/or that Brunner insisted on surgery is not unsupported by substantial evidence. Also, Brunner has not shown that the ALJ relied on a mistake of fact when reaching his conclusion that Brunner's symptoms were not as limiting as she alleged or that the decision as a whole is unsupported by substantial evidence.

Second, Brunner contends that the ALJ's finding that "examinations in the record . . . 'have consistently, albeit not universally, reported either mildly adverse, or normal findings[,]'" is unsupported by substantial evidence. Doc. 14, p. 15, Doc. 18, p. 3. Brunner takes issue with the fact that the ALJ did not cite to other records that contained "positive or abnormal findings" and argues that findings contained in records referenced by the ALJ are "on balance not mildly adverse or normal." Doc. 14, pp. 15-16. The undersigned finds that Brunner's argument amounts to a request that the Court review the evidence de novo. "[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 144 Fed. Appx. 727, 733 (6th Cir. Nov. 18, 2004) (internal citation and quotations omitted). Nevertheless, the ALJ did in fact discuss and cite to October 3, 2018, examination findings, which is one of the records that Brunner

33

contends that the ALJ ignored.  See Tr. 20 (discussing October 3, 2018, clinical examination and noting both position and negative exam findings).

Furthermore, even records cited by Brunner in support of her claim that exam findings were generally positive and abnormal also contain normal findings.  For example, Brunner cites an April 11, 2018, treatment note from a visit with Dr. Zakari, indicating that it shows that she had tenderness, an impaired gait, and that ongoing ambulation with assistance was recommended.  Doc. 14, p. 16.  However, that record also shows that Brunner appeared more comfortable than at a prior exam, the tenderness was only mild to moderate, and sitting straight leg raise was negative bilaterally.  Tr. 1236.  Also, while Dr. Zakari indicated that Brunner should continue to use an assistive device to decrease risk of fall, Dr. Zakari also encouraged Brunner to stay active and exercise on a regular basis.  Tr. 1237.  Additionally, the ALJ did not disregard examination findings that indicated Brunner had an abnormal gait.  *See e.g.,* Tr. 17 (noting that "[s]ince roughly mid-2018, the claimant has exhibited an abnormal gait, in that she walks listing to the right); Tr. 22 (indicating that Brunner's "more recent gait deficits . . . militate towards a finding of sedentary work[]").

Also, Brunner cites a May 31, 2018, treatment note from a visit with Dr. Vucetic, arguing that it shows Brunner had decreased range of motion, pain, spasm in the back and stocking-glove-distribution sensory deficit in the lower extremities.  Doc 14, p. 16.  However, the same record shows that Brunner had normal strength; no weakness, atrophy, or tremor; normal muscle tone; normal straight leg raise; and normal coordination (Tr. 1401).  And, as another example, while Brunner cites an October 3, 2018, treatment note from a visit with Dr. Vucetic to demonstrate that she exhibited a reduced range of motion, tenderness, pain, spasm, sensory deficit in feet, (Doc. 14, p. 16), that treatment note also shows that Brunner had normal strength;

34

no weakness, atrophy, or tremor; normal muscle tone; normal straight leg raise; and normal coordination (Tr. 1418, *see also* Tr. 1458 (duplicate copy of October 3, 2018, treatment note)). Furthermore, as discussed earlier, the ALJ did in fact discuss the October 3, 2018, examination findings (both normal and abnormal).  Tr. 20.

The ALJ discussed abnormal exam findings and in fact acknowledged that all examinations were not mildly adverse or normal.  Tr. 20 ("Clinical examinations in the record have consistently, albeit not universally, reported either mildly adverse, or normal findings . . .").  Thus, Brunner's suggestion that the ALJ ignored abnormal findings is unfounded.  Moreover, it is not for this Court to reweigh the evidence regarding the clinical examination findings.  Nor has Brunner shown that the ALJ's findings with respect to the examination findings are unsupported by substantial evidence.

Even, assuming arguendo that the ALJ erred in one or both of the ways suggested by the Plaintiff, the ALJ's analysis of Brunner's subjective allegations and her RFC was  not solely premised on the ALJ's finding that there was reluctance on the part of the surgeon to perform surgery and/or that clinical examination findings were consistently but not always mildly adverse or normal.  For example, the ALJ considered the opinions of the state agency reviewing consultants who opined that Brunner could perform light exertional work.  Tr. 22.  In doing so, the ALJ assigned the opinions little weight because he found that the record supported greater limitations than those assessed by the state agency reviewers, explaining in part, "The claimant's surgical history and more recent gait deficits both militate towards a finding of sedentary work."  Tr. 22.  The ALJ also considered objective diagnostic test results and Brunner's daily activities.  Tr. 19, 22.  Moreover, when considering the severity of Brunner's allegations, the ALJ took into account Brunner's response to treatment as well as the fact that, even though various treatment

alternatives were recommended, e.g., physical therapy and spinal cord stimulator, Brunner delayed or had not yet proceeded with such treatment.  Tr. 20.

Also, the ALJ considered that the record lacked treating or examining physician opinions "relevant to the formulation of the residual functional capacity."  Tr. 24.  In her reply brief, Plaintiff contends that Dr. Cecil's medical records support a more limited RFC.  Doc. 18, p. 3.  However, she has not shown that the ALJ failed to consider Dr. Cecil's treatment records or that those treatment records constitute a medical opinion.

For the reasons explained herein, the undersigned finds that Brunner has not shown that the ALJ committed reversible error.  Nor has she shown that the sedentary RFC as assessed by the ALJ is unsupported by substantial evidence.

### VII. Recommendation

For the reasons discussed herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


June 11, 2021                                   */s/ Kathleen B. Burke*
                                                Kathleen B. Burke
                                                United States Magistrate Judge



### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).