UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
--------------------------------------------------------------

| | | |
|---|---|---|
| JODY BRUNNER, | : | |
| | : | Case No. 5:20-cv-1238 |
| Plaintiff, | : | |
| | : | OPINION & ORDER |
| | : | [Resolving Docs. 19 & 20] |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

--------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On June 5, 2020, Plaintiff Jody Brunner filed a complaint seeking judicial review of Defendant Commissioner of Social Security's decision to deny her disability insurance benefits.[1]  The Court referred the matter to Magistrate Judge Kathleen B. Burke.

On June 11, 2021, Magistrate Judge Burke issued a Report and Recommendation ("R&R") recommending that this Court affirm the Commissioner's decision.[2]  Plaintiff Brunner objects to the R&R,[3] and the Commissioner replies.[4]  For the reasons stated below, this Court **OVERRULES** the Plaintiff Brunner's objections, **ADOPTS** the R&R, and **AFFIRMS** the Commissioner's decision.

I.       BACKGROUND

The Court recounts the R&R's thorough summary of the record here.

*A. Treatment History*

---

[1] Doc. 1.
[2] Doc. 19.
[3] Doc. 20.
[4] Doc. 21.

Case No. 5:20-cv-1238
Gwin, J.

Plaintiff Brunner, who previously worked in customer service,[5] filed a disability insurance benefits application with a February 12, 2017 alleged disability onset date, when she was 46 years old.[6]  Brunner claimed that her lumbar and cervical spine stenosis and degenerative disc disease, among other conditions, caused her chronic pain that made work impossible.[7]

Plaintiff Brunner has experienced back pain since at least May 20, 2016.[8]  On October 19 and 21, 2016, Brunner underwent CT and MRI examinations of her lower spine, revealing "[m]ild canal stenosis L4-L5 from facet joint degenerative changes and disc bulging" and "[m]inor degenerative disc disease T12-L1."[9]

On February 20, 2017, after epidural lumbar steroid injections failed to resolve her pain, Brunner saw Dr. Daniel Dorfman, M.D.  On examination, Dr. Dorfman observed that Brunner was "ambulating with a slow, but symmetrical gait pattern," with a limited, painful range of motion and "diffuse tenderness of the lower lumbar musculature."[10]

Dr. Dorfman concluded that Plaintiff Brunner suffered from "[s]pinal stenosis at the L4-L5 level with ongoing radicular symptoms incompletely alleviated with conservative management" and "connective tissue and disc stenosis of intervertebral foramen at the L4-L5 level."[11]  Because non-surgical methods had proven ineffective to treat Brunner's

---

[5] Doc. 13 at 255.
[6] *Id.* at 18.
[7] *Id.* at 21.
[8] *Id.* at 488.
[9] *Id.* at 520, 569.
[10] *Id.* at 590–92.
[11] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

condition, Dr. Dorfman referred Brunner to Dr. Mark Cecil, M.D. for surgical decompression.[12]

At her April 3, 2017 initial meeting with Dr. Cecil, Brunner continued to complain of back pain.[13]  On examination, Dr. Cecil found "lumbar spondylosis with lumbar spinal stenosis and adult de novo scoliosis with spondylolisthesis at L4-5."[14]  A May 16, 2017 CT scan supported this finding.[15]

Despite these findings, however, Dr. Cecil concluded that "no compelling radiographic evidence [suggested] surgically significant compressive pathology within the lumbar spine."[16]  Dr. Cecil was accordingly "hesitant to recommend surgical intervention which would include complex reconstruction of the thoracolumbosacral spine."[17] Consistent with his recommendation for non-surgical treatment, Dr. Cecil recommended a treatment plan primarily based on "pain management and behavioral modification."[18]

On July 7, 2017, after two emergency room visits for back pain on May 24 and June 18, 2017, Brunner saw Dr. Cecil for a follow-up.[19]  Brunner complained that her back pain symptoms had not resolved and expressed her willingness to undergo surgical treatment options.[20]

---

[12] *Id.*
[13] *Id.* at 800–02.
[14] *Id.*
[15] *Id.*
[16] *Id.* at 814.
[17] *Id.*
[18] *Id.*
[19] *Id.* at 722–24; 750–51; 821–24.
[20] *Id.* at 821.

Case No. 5:20-cv-1238
Gwin, J.

After examination, Dr. Cecil noted "no new nor progressive motor or sensory deficits" in Brunner's condition.[21]  However, Dr. Cecil reviewed recent and past diagnostic testing, and though he remained unwilling to recommend "global reconstruction of the axial skeleton," Dr. Cecil suggested "a limited and perhaps less comprehensive approach, that being lumbar decompression via laminectomy and facetectomy at L4-5 with segmental spinal fusion and instrumentation at L4-5."[22]

On September 14, 2017, Dr. Cecil performed the recommended "laminectomy at L4, bilateral facetectomies at L4-L5, posterior segmental spinal instrumentation L4-L5, and posterolateral spinal fusion L4-L5" on Plaintiff Brunner.[23]

After the surgery, Brunner says her symptoms did not improve.  At a September 29, 2017 post-op appointment with Dr. Cecil, Brunner reported continuing severe pain.[24]  Dr. Cecil's examination and an x-ray, however, showed no evidence of either surgical failure or negative progression of Brunner's back condition.[25]  After the September 2017 follow-up visit, Dr. Cecil gave the opinion that Brunner was "clinically better" but still suffering from "comorbid conditions most significantly nonorganic factors probably associated with depression and anxiety."[26]  Dr. Cecil also cited "chronic opioid utilization" as a contributing factor.[27]

---

[21] *Id.* at 823.
[22] *Id.*
[23] *Id.* at 884–86.
[24] *Id.* at 936–37.
[25] *Id.* at 938.
[26] *Id.*
[27] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

On October 18, 2017, Plaintiff Brunner saw Dr. David Gutlove, M.D.[28]  Dr. Gutlove noted that Brunner's gait was "fairly normal" and that Brunner could "toe raise, heel raise and do deep knee bend[s] without to[o] much difficulty."[29]  However, Brunner could not perform lumbar extension or flexion motion.[30]  Brunner's straight leg raise was negative in a sitting position and deep tendon reflexes "were brisk but bilaterally symmetrical."[31]  Dr. Gutlove recommended counseling with a clinical rehabilitation psychologist, physical therapy, and short-term opioid pain relief.[32]

On October 24, 2017, Brunner saw Dr. Gregg Martin, Ph.D., for a psychological evaluation.[33]  Dr. Martin diagnosed Brunner with a major depressive episode and severe pain disorder with medical and psychological factors contributing.[34]

On October 27, 2017, Brunner saw Dr. Cecil about a year after Dr. Cecil performed the surgery.[35]  According to Dr. Cecil's records, "Initially . . . [Brunner] did well, but subsequently had gradual recurrence of diffuse nonspecific pain which did not correlate with clinical findings."[36]  Dr. Cecil also noted that Brunner's gait was normal and she rose "fairly rapidly from a seated position."[37]  Straight leg raising testing was negative bilaterally for

---

[28] *Id.* at 913–16.
[29] *Id.* at 915.
[30] *Id.*
[31] *Id.*
[32] *Id.* at 916.
[33] *Id.* at 939–40.
[34] *Id.* at 940.
[35] *Id.* at 941–48.
[36] *Id.* at 943.
[37] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

radiculitis.[38] Brunner told Dr. Cecil that "she [was] better . . . than she was 3 weeks ago," but she also indicated that she was experiencing 'burning' pain in the fingertips and the toes."[39]

Dr. Cecil recommended physical therapy, but Brunner said she was "'terrified'" of going because she was concerned that she would experience a back pain flare up.[40] Additionally, Dr. Cecil "suspect[ed] that the most important intervention at [that] point would be the 'psychosocial piece' to address what may be a mood/adjustment disorder."[41]  Brunner was "amenable to seeking treatment to address these factors."[42]

In late 2017 and early 2018, Brunner continued to seek emergency room treatment for her back pain, and she continued to see Dr. Gutlove for pain management.[43] At the emergency room on November 4, 2017, Brunner's physical examination was normal with a negative straight leg raise.[44]  Orthopedists use straight leg raising tests to check for spinal nerve impingement and for lumbar muscle spasms.

On January 17, 2018, Brunner again visited Dr. Cecil complaining of numbness in her legs and feet, difficulty walking, cramping, pain, stiffness and swelling.[45]   On examination, Dr. Cecil observed that Brunner was in no acute distress; she sat comfortably; she rose fairly rapidly from a seated position; she preferred to stand rather than sit; she winced intermittently with pain, with the predominant area being her left buttocks; and her

---

[38] *Id.* `
[39] *Id.*
[40] *Id.*.
[41] *Id.*
[42] *Id.*
[43] *Id.* at 900–12, 927–31.
[44] *Id.* at 928.
[45] *Id.* at 945–48.

Case No. 5:20-cv-1238
Gwin, J.

gait was normal and not antalgic or myelopathic.[46]  Dr. Cecil again concluded that Brunner's "pain is likely multifactorial with both organic and nonorganic contributors," noting that Brunner admitted she suffered from "extreme anxiety."[47]

During a January 18, 2018 visit with Dr. Gutlove, Brunner walked slowly with a deliberate gait but without an antalgic component.[48]  Dr. Gutlove observed that Brunner had full strength in her lower extremities but with minimal range of motion in the lumbar spine due to pain.[49]

On January 19, 2018, Brunner saw Dr. Krishna Satyan, M.D., for evaluation regarding her lower back pain.[50]   Brunner relayed that, since her surgery, she had been having worsening bilateral lower extremity pain, numbness, tingling, and weakness.[51]   Dr. Satyan ordered a lumbar CT and lumbar myelogram to see if there was compression in the nerve roots.[52] On examination, Dr. Satyan observed that Brunner's gait was "compensated [and] antalgic [on] both sides[.]"[53]  Brunner did not use an assistive device.[54]  On straight leg raise, there was radiation on both sides.[55] Otherwise, examination findings were normal, including normal strength, sensation, and coordination.[56]

---

[46] *Id.*
[47] *Id.* at 947.
[48] *Id.* at 900–03.
[49] *Id.*
[50] *Id.* at 949–54.
[51] *Id.* at 949.
[52] *Id.* at 949, 953.
[53] *Id.* at 952.
[54] *Id.*
[55] *Id.*
[56] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

On January 31, 2018, Brunner again sought emergency room treatment for bilateral lower extremity and back pain.[57]  On examination, Brunner was able to move all extremities well; her gait was normal; there was some paralumbar tenderness to palpation; there was no tenderness to palpation over the SI regions; straight leg raise was negative bilaterally; patellar reflexes were 2+ bilaterally; and sensation was intact in the bilateral lower extremities.[58] The emergency room provider found these observations consistent with "acute [. . .] chronic back pain."[59]

On February 5, 2018, Brunner saw Dr. Adel Zakari, M.D., regarding a spinal cord stimulator trial.  Dr. Zakari observed limited range of motion in the lumbar spine with flexion and extension; moderate tenderness on palpation of the lower lumbar paraspinal area bilaterally; moderate tenderness on palpation of the sacroiliac joints; positive straight leg raise bilaterally; "antalgic and short stepped" gait; ambulation without an assistive device; inability to perform heel and toe walking; no gross weakness; normal sensation to light touch; no peripheral edema in the lower extremities; good range of motion in the hips bilaterally; and negative FABER test bilaterally.[60]  Dr. Zakari noted that Brunner reported improvement of her lower back pain following surgery, but Brunner continued to have persistent diffuse pain in her lower extremities.[61]

---

[57] *Id.* at 971–87.
[58] *Id.* at 973–74.
[59] *Id.* at 974.
[60] *Id.* at 1070.
[61] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

On February 23, 2018, Brunner returned to see Dr. Satyan for a follow up regarding her diagnostic testing and back pain.[62] Examination findings were normal.[63] Dr. Satyan indicated that the CT myelogram showed "postop changes from the L4-5 decompression and fusion. [Brunner] may have some foraminal stenosis at left L4-5.[64] However, it looks like they did an adequate bony removal."[65] Dr. Satyan also indicated that he did "not see how any further surgery would benefit at this point."[66]

Brunner saw Dr. Cecil on February 28, 2018.[67] On examination, Brunner rose rapidly from a seated position; her gait was normal and not antalgic or myelopathic; her motor strength was 5/5; and straight leg raise was negative bilaterally for radiculitis.[68] Dr. Cecil's impression at that time was that Brunner had "some variant of chronic pain syndrome."[69] Dr. Cecil did not feel that "additional 'conventional' spinal surgical intervention would be appropriate."[70] Dr. Cecil noted that he would see Brunner after the DCS trial and after her rheumatology evaluation.[71] Noting that "the etiology of [Brunner's] pain [was] likely multifactoral and involve[d] both organic and nonorganic pathologies," Dr. Cecil described Brunner's prognosis as "guarded" at that time.[72]

---

[62] *Id.* at 1081–84.
[63] *Id.* at 1083.
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.* at 1136–39.
[68] *Id.* at 1138.
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*

-9-

Case No. 5:20-cv-1238
Gwin, J.

On March 9, 2018, Brunner saw Dr. Zakari.  Brunner reported that her symptoms had worsened since her last visit.[73]  She indicated that she had been going to physical therapy.[74]  Brunner relayed that she had an appointment scheduled with Dr. Martin the following week for the psychological evaluation needed before proceeding with the spinal cord stimulator trial.[75]

Dr. Zakari noted Brunner ambulated with a cane.[76]  Her gait was "antalgic and short stepped."[77]  There was moderate tenderness to palpation in the lower lumbar paraspinal area bilaterally and in the sacroiliac joints.[78]  Seated straight leg raise was positive bilaterally.[79]  Sensation was normal to light touch and reflexes were $2+$ at the knees.[80]  There was no peripheral edema in the lower extremities and there was good range of motion in the hips.[81]

A week later, Brunner returned to see Dr. Zakari and complained of worsening symptoms.[82]  Brunner relayed that she had recently seen Dr. Martin but was informed by him that he did not perform psychological evaluations for spinal cord stimulators.[83]  Dr. Zakari's examination findings were similar to the March 9, 2018 findings just described.[84]

On March 16, 2018, Brunner saw Dr. Achal Valdya, M.D., for a consultation regarding her back and lower extremity complaints.  Dr. Valdya observed that Brunner used

---

[73] *Id.* at 1100.
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.* at 1102.
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.* at 1233.
[83] *Id.*
[84] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

a cane and had an antalgic, slow gait.[85]  Dr. Valdya could not check Brunner's range of

motion in the spine due to pain.[86]  No abnormalities were noted on examination of Brunner's

lower extremities.[87]  Dr. Valdya's primary diagnosis was primary generalized (osteo) arthritis

but there was no inflammatory arthritis noted.[88]  Dr. Valdya ordered some further diagnostic

testing and recommended that Brunner continue with pain management.[89]

        Brunner saw Dr. Zakari on April 11, 2018, for a follow up.[90]  Brunner reported that

her symptoms had improved since her last visit; she had improved pain control with taking

Percocet three times per day.[91]

        Dr. Zakari observed that Brunner appeared to be in moderate distress at times but she

appeared more comfortable than she had during her prior examination.[92]  There was mild

tenderness to palpation of the lumbar paraspinal area and moderate tenderness of the

sacroiliac joints; sitting straight leg raise was negative bilaterally; her gait was "antalgic and

short stepped" and she ambulated with a cane; sensory examination was normal to light

touch; reflexes were 2+ at the knees; there was no peripheral edema in the lower

extremities; and there was good range of motion in the hips.[93]

---

[85] *Id.* at 1230.
[86] *Id.*
[87] *Id.* at 1231.
[88] *Id.*
[89] *Id.*
[90] *Id.* at 1239–42.
[91] *Id.* at 1239.
[92] *Id.* at 1241.
[93] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

On April 23, 2018, Brunner saw Dr. Michael Steinmetz, M.D., at the Cleveland Clinic for a surgical consult.[94]  Examination findings were normal.[95]  Dr. Steinmetz recommended another lumbar CT scan and that Brunner see another physician—Dr. Vucetic—for evaluation for conservative pain management.[96]

On May 31, 2018, Brunner saw Dr. Henry Vucetic, M.D., for a pain management consultation.[97]  On examination, Dr. Vucetic observed an antalgic gait, muscle spasms, reduced range of motion and some decreased sensation in the lower extremities.[98]  Her strength, muscle tone and coordination were normal and straight leg raise test was normal.[99]  Dr. Vucetic also recommended a caudal epidural steroid injection and physical therapy, noting that Brunner had not been to physical therapy since her surgery but Dr. Vucetic felt Brunner needed it.[100]

On June 25, 2018, Brunner went to the emergency room for her back pain.[101]  She reported a pain level of 10/10.[102]  With the exception of right-sided paralumbar tenderness and midline surgical scar, examination findings were generally normal.[103]

---

[94] *Id.* at 1267–70.
[95] *Id.* at 1269.
[96] *Id.*
[97] *Id.* at 1403–08.
[98] *Id.* at 1406.
[99] *Id.*
[100] *Id.* at 1407.
[101] *Id.* at 1243–46.
[102] *Id.*
[103] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

On Dr. Steinmetz's order, on April 21, 2018, Brunner had an MRI of her lumbar spine.[104]  The impression was "[m]ild multilevel degenerative changes with a superimposed L4-L5 fusion and laminectomy," with "[n]o stenosis at any level."[105]

On September 5, 2018, Brunner saw Dr. Steinmetz.[106]  Brunner was continuing to have pain and was "staying largely immobile."[107]  Dr. Steinmetz observed an antalgic gait and some sensory deficits at L4, L5, and S1.[108]  Dr. Steinmetz indicated that there was no nerve compression shown on the CT scan or MRI.[109]  However, he noted that there was "breech of anterior sacrum with the right S1 screw but her symptoms in her legs [were] bilateral."[110]  Dr. Steinmetz felt there was "a chance she [did] not have a solid fusion and [that] could be a cause of some of her pain."[111]  Dr. Steinmetz ordered another lumbar CT and noted that he felt that Brunner's best option at that time was a spinal cord stimulator trial.[112]

Brunner saw Dr. Vucetic on October 3, 2018, for a follow up.[113]  Brunner reported her pain level was 8/10.[114]  She was interested in adjusting her medications and proceeding with the spinal cord stimulator because her medications were "not holding her over through the day[.]"[115]  On examination, Brunner had decreased range of motion, tenderness, pain

---

[104] *Id.* at 1345–46.
[105] *Id.* at 1346.
[106] *Id.* at 1430–33.
[107] *Id.* at 1430.
[108] *Id.* at 1431.
[109] *Id.*
[110] *Id.*
[111] *Id.*
[112] *Id.*
[113] *Id.* at 1419–25.
[114] *Id.* at 1419.
[115] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

and spasm in her lumbar spine.[116]  She had a sensory deficit in the lower extremities and

abnormal gait but, her muscle tone, coordination and straight leg raise were normal.[117]  Dr.

Vucetic indicated that Brunner had chronic low back and leg pain with chronic

radiculopathy as seen on EMG.[118]  He agreed that Brunner was a good candidate for a spinal

cord stimulator and referred her for a psychology consult.[119]

An October 5, 2018, a CT scan of Brunner's lumbar spine showed that there was no

"solid bone fusion with epidural site[]" but Brunner's "[h]ardware [was] intact without signs

of loosening[] [and] [a]lignment [was] unchanged."[120]

B. *Opinion Evidence*

On March 15, 2017, Dr. Jay Smith, D.C., a state medical consultant, reported that

Brunner's clinical abnormalities included cervical, thoracic, and lumbar pain; sciatica; and

the presence of thoracolumbar curvature.[121]  Dr. Smith noted that he had observed decreased

sensation in the L5 dermatome; spasm of the trapezius and lumbar paravertebral muscles;

and reduced lumbar range of motion.[122]  Dr. Smith indicated that Brunner's gait was normal

and no ambulatory aid was used.[123]  He indicated that, despite therapy, Brunner's symptoms

had persisted.[124]

---

[116] *Id.* at 1423.
[117] *Id.*
[118] *Id.* at 1424.
[119] *Id.*
[120] *Id.* at 1348.
[121] *Id.* at 702.
[122] *Id.*
[123] *Id.*
[124] *Id.*

-14-

Case No. 5:20-cv-1238
Gwin, J.

On March 27, 2017 state agency reviewing consultant Venkatachala Sreenivas, M.D., opined that Brunner could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and ability to push and/or pull was "unlimited, other than shown for, lift and/or carry.[125] Dr. Sreenivas also opined that Brunner could never climb ladders, ropes, or scaffolds but she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl.[126] Also, Dr. Sreenivas opined that Brunner would need to avoid exposure to unprotected heights and heavy machinery.[127]

On August 10, 2017, upon reconsideration, state agency reviewing consultant Dr. William Bolz, M.D., reached a conclusion similar to Dr. Sreenivas' assessment except for the postural limitations.[128]  Like Dr. Sreenivas, Dr. Bolz opined that Brunner could never climb ladders, ropes, or scaffolds but that she could occasionally climb ramps or stairs, stoop, and crawl.[129]  However, Dr. Bolz opined that Brunner could frequently, rather than occasionally, balance, kneel, and crouch.[130]

### C.  Hearing Testimony

#### 1.  Plaintiff's Testimony

On November 6, 2018, Brunner testified and was represented at a hearing before the ALJ.  When Brunner was asked why she was unable to work, Brunner stated:

> Well, I have a lot of pain, first off. My balance and coordination is terrible. Peripheral neuropathy is in my fingers and -- and my legs and feet. And I'm

---

[125] *Id.* at 288–89.
[126] *Id.* at 289.
[127] *Id.* at 290.
[128] *Id.* at 305–07.
[129] *Id.*
[130] *Id.*

Case No. 5:20-cv-1238
Gwin, J.

sure you've dealt with neuropathy before that it can have various amounts of pain. Also, with the medication I'm on, I'm very -- I have trouble focusing, finding words, sitting for long periods of time or even standing and walking.[131]

Brunner discussed the different treatments she had tried to address her pain.[132] She estimated being able to walk at one time a block or two on a good day.[133] With respect to her ability to stand, Brunner stated that "the pain would get so bad after five, ten minutes."[134] Brunner indicated that her ability to sit "varie[d] between good and bad days."[135] She explained that, if she can lean back, she "can sit sometimes between 20, 40 minutes."[136] However, she indicated "I'm shifting in my seat the whole time and . . . it just hurts and my hands hurt."[137]

On a normal, moderate day, Brunner wakes up and takes her medicine before her son gets up so she can move around a little easier.[138]  She makes breakfast for her son and has her son's clothes laid out for him.[139]  After her son leaves for school, depending on how Brunner slept the night before, she lies down for an hour to three hours.[140]  When she is able to get back up, she tries to shower and get herself dressed.[141]

After getting dressed, Brunner tries to straighten up around the house, but her husband does most of the cleaning.[142]  Brunner is able to do some light cooking and help with the

---

[131] Id. at 259.
[132] *Id.* at 259–60.
[133] *Id.* at 260–61.
[134] *Id.* at 261.
[135] *Id.*
[136] *Id.*
[137] *Id.*
[138] *Id.* at 262.
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.* at 262–64.

Case No. 5:20-cv-1238
Gwin, J.

laundry.[143] Her husband does all the grocery shopping.[144] On a bad day, Brunner indicated

she was in bed all day.[145] Brunner estimated that more than half of the days in a month

would be classified as bad days.[146]

Brunner's indicated that side effects of her medications include a "cloudy mind,"

drowsiness, confusion, problems with balance and coordination, blurry vision, and

nausea.[147] She relayed that she had trouble falling asleep because of her pain.[148] Once she

is asleep, she usually wakes up an hour or two later from the pain.[149]

### 2. *Vocational Expert's Testimony*

A vocational expert testified at the hearing.[150] The ALJ asked the vocational expert

about potential jobs in the national economy for a claimant of Brunner's age and education

level limited to "carrying occasionally 20 pounds and frequently 10 pounds, with sitting,

standing and walking for up to six hours of the work day and push and pull as much as she

can lift and carry, with the additional limitations of only occasionally climbing ramps and

stairs; never climbing ladders, ropes or scaffolds; frequently balancing; occasionally

stooping, kneeling, crouching and crawling; never unprotected heights and never any

moving mechanical parts; and limited to tolerating few changes in a routine work setting."[151]

---

[143] *Id.*
[144] *Id.* at 263.
[145] *Id.* at 262.
[146] *Id.*
[147] *Id.* at 268.
[148] *Id.* at 269.
[149] *Id.*
[150] *Id.* at 270–76.
[151] *Id.* at 273.

Case No. 5:20-cv-1238
Gwin, J.

The vocational expert testified that such an individual would not be unable to perform Brunner's past relevant work but there would be jobs in the national economy that the described individual could perform, including addresser, document preparer, and film touch-up inspector.[152]

Brunner's counsel asked the vocational expert to consider the same sedentary hypothetical but to add that, due to pain, medication side effects or other symptoms, the described individual would be absent from work, or have to leave early from work, three times or more per month on a regular and ongoing basis.[153]  The expert indicated that there would be no work available for that described individual.[154]

### D.  The ALJ's Decision

On February 21, 2019, the ALJ denied Brunner Disability Insurance Benefits.[155]  The ALJ concluded that while Brunner suffers from "severe impairments," including lumbar and cervical spine stenosis, degenerative disc disease, and depression, "the record, when considered as a whole" did not show "the existence of th[ese] impairment[s]" to be "preclusive of all types of work."[156]

The ALJ combed through the large medical record in this case, concluding that:

> *Notably, the claimant's surgeon was reluctant to perform surgery (18F/21); however, the claimant insisted* (18F/29). At her hospital discharge, she reported marked diminution of her radicular symptoms (22F/21).
>
> She has consulted with several other surgeons; however, there is no indication for further surgical intervention (28F/3), (41F/2).
>
> *         *         *         *         *

---

[152] *Id.* at 273–74.
[153] *Id.* at 275.
[154] *Id.*
[155] *Id.* at 31.
[156] *Id.* at 21–24.

Case No. 5:20-cv-1238
Gwin, J.

> *Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or normal findings,* including one dated February 3, 2017, which indicated diffuse tenderness to the lumbar spine with reduced flexion and extension, with four of five ankle strength [but with give-away weakness] and otherwise normal strength of the lower extremities, with normal sensory function and a slow, but symmetrical gait (10F/3), one dated January 31, 2018, which indicated paralumbar tenderness but no sacroiliac tenderness, with a normal gait, negative straight leg raises, normal reflexes and sensation (25F/4), or one dated June 25, 2018, which indicated right-sided paralumbar tenderness, but normal range of motion in all extremities, normal strength and sensation, with negative straight leg raises (38F/11). Her most recent clinical examination, dated October 3, 2018, indicated reduced range of motion, tenderness and pain, with a listing gait to the right, positive sacroiliac provocation test, reduced sensation in a stocking pattern, but negative straight leg raises, normal coordination, reflexes and strength (42F/25).
>
> \*        \*        \*        \*        \*
>
> In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. In a setting where the claimant would be restricted to the performance of work at the sedentary exertional level, would frequently balance, occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but never climb ladders, ropes or scaffolds; and, where the claimant would avoid all exposure to workplace hazards, including unprotected heights and moving mechanical parts, adequate allowance will have been made for these impairments.[157]

On April 9, 2020, the Appeals Council affirmed the ALJ's decision, making the Commissioner's decision final.[158]

### E. Federal Court Proceedings

On June 5, 2020, Plaintiff Brunner filed for judicial review of Commissioner's decision in this Court.[159]  Generally, Brunner argues that the ALJ's finding that Brunner can perform sedentary jobs is not supported by substantial evidence.  To that end, Brunner argues that (1) the ALJ misconstrued Brunner's surgery as medically unnecessary by noting that Dr.

---

[157] *Id.* at 24–26.
[158] *Id.* at 6.
[159] Doc. 1.

Case No. 5:20-cv-1238
Gwin, J.

Cecil was initially "reluctant to perform the surgery"; and (2) that the ALJ's finding that "[c]linical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or normal findings" misstates the record.[160]

On June 11, 2021, Magistrate Judge Burke issued a Report and Recommendation ("R&R") recommending that this Court affirm the Commissioner's decision.[161]   Brunner objects, raising the same arguments she did in her initial brief.[162]  The Commissioner opposes Brunner's objections.[163]

## II. LEGAL STANDARD

### II.A    *Standard for Establishing Disability*

To establish disability under the Social Security Act, a claimant must show "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[164] The claimant's impairment must prevent her from doing her previous work, as well as any other work existing in significant numbers in the national economy.[165]

### II.B    *Substantial Evidence Review*

The Federal Magistrates Act requires a district court to conduct de novo review of the claimant's R&R objections.[166]   Both the Magistrate and this Court's review of the ALJ's

---

[160] Doc. 14 at 14–18.
[161] Doc. 19.
[162] Doc. 20.
[163] Doc. 21.
[164] *See* 42 U.S.C. § 423(d)(1)(A).
[165] *See* 42 U.S.C. § 423(d)(2)(A).
[166] 28 U.S.C. § 636(b)(1).

-20-

Case No. 5:20-cv-1238
Gwin, J.

decision is limited to whether the decision is "supported by substantial evidence and was made pursuant to proper legal standards."[167]

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[168]    Put differently, it is "more than a mere scintilla of evidence," "but less than a preponderance."[169]  When substantial evidence supports the ALJ's decision, a court may not reverse, even if the court would arrive at a different conclusion than the ALJ.[170]  On review, this Court may not resolve evidentiary conflicts or decide credibility questions.[171]

## II.    ANALYSIS

As in many cases with a complex record, the Court finds it helpful here to focus attention on the disputed issues by identifying the common ground.  All agree that Plaintiff Brunner suffers from a severe back condition that prevents her from performing most forms of work.  All agree that Brunner's subjective reports of severe pain are corroborated by the objective clinical observations of the many physicians who have treated Brunner.  And all agree that Brunner underwent surgery, physical therapy, and other forms of treatment to address her condition.

---

[167] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 42 U.S.C. § 405(g)).
[168] *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).
[169] *Brown v. Comm'r of Soc. Sec.*, 814 F. App'x 92, 95 (6th Cir. 2020) (citing *Biestek*, 139 S. Ct. at 1154; then citing *Rogers*, 486 F.3d at 241).
[170] *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009).
[171] *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

Case No. 5:20-cv-1238
Gwin, J.

The core issue in this case, as the ALJ observed, is whether Brunner's condition is so severe that it is "preclusive of all types of work."[172]  Here, working through a large administrative record, the ALJ determined that Brunner did not meet that standard.[173]

The federal courts' limited role in this administrative review context bears repeating. This Court does not review the ALJ's decision de novo or substitute its judgment for the ALJ's.[174]  Rather, the limited question before this Court is whether the ALJ's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[175]The record in this case would cause reasonable minds to differ. Brunner's condition is well-documented. The pain that she suffers from has severely disrupted her professional and personal life.  On a bad day, Brunner cannot get out of bed.[176] She cannot walk short distances.[177]  She was previously "always . . . in the stands" cheering on her youngest son during football and basketball games but has been able to attend entire seasons.[178]

But in considering this evidence in connection with many doctors' reports, the ALJ made its determination. The law vests discretion to resolve such questions in ALJs.[179]

Plaintiff Brunner's objections to the ALJ's decision and the R&R do not change this conclusion.  As Magistrate Judge Burke noted, the ALJ's observation that Dr. Cecil was

---

[172] Doc. 13 at 24.
[173] *Id.*
[174] *Rogers*, 486 F.3d at 241.
[175] *Biestek*, 139 S. Ct. at 1154.
[176] Doc. 13 at 260.
[177] *Id.* at 261.
[178] *Id.* at 265.
[179] *Biestek*, 139 S. Ct. at 1154.

Case No. 5:20-cv-1238
Gwin, J.

initially "reluctant to perform surgery" is supported by Dr. Cecil's own treatment notes.[180]

Additionally, Brunner did not show that the ALJ relied on a mistake of fact in reaching its

decision.[181]

Similarly supported is the ALJ's observation that "[c]linical examinations included in

the record have consistently, albeit not universally, reported either mildly adverse, or normal

findings."[182]  In objecting to this ALJ observation, Brunner cites fourteen exams observing

that Plaintiff was suffering from pain, reduced range of motion, and an abnormal gait.[183]

But Brunner's objection does not demonstrate reversible error.  The ALJ stated in the

very sentence Brunner's takes issue with that clinical examinations consistently produced

"mildly adverse" findings.[184]  The ALJ also noted that the mild findings were not

"universal[]."[185]

The evidence Brunner cites does not factually contradict the ALJ's characterization of

the clinical findings as "mild" as opposed to severe, or some other similar term.  When

applying the governing regulations, the ALJ described Brunner's back conditions as "severe

impairments," reflecting that the ALJ considered the whole record.[186]

For the reasons described in the R&R, the ALJ had sufficient record evidence on

which to base his sedentary residual functional capacity finding.  In this context, it does not

matter that another reviewer could have reached a different conclusion.[187]  Because the ALJ's

---

[180] Doc. 13 at 814.
[181] *Id.*
[182] *Id.* at 25.
[183] Doc. 20 at 1–2 (citing Doc. 14 at 15–16).
[184] Doc. 13 at 25.
[185] *Id.*
[186] *Id.* at 21.
[187] *Lindsley*, 560 F.3d at 604.

-23-

Case No. 5:20-cv-1238
Gwin, J.

decision was "supported by substantial evidence" and "made pursuant to proper legal standards," no reversible error occurred.[188]

### IV. CONCLUSION

For these reasons, this Court **OVERRULES** Brunner's objections, **ADOPTS** the R&R, and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED

Dated:  September 20, 2021            _s/      James S. Gwin_
                                     JAMES S. GWIN
                                     UNITED STATES DISTRICT JUDGE

---

[188] *Rogers*, 486 F.3d at 241.